IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **MARY LEE DAVIS, as** ) | |
| **Administrator of the Estate of** ) | |
| **Fletcher Ray Stewart, deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:16-cv-855-CDL-DAB** |
| ) | |
| **BRYAN EDWARDS**, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Mary Lee Davis, as administrator of the Estate of Fletcher Ray Stewart, alleges constitutional violations and a state law wrongful death claim against Defendants, Bryan Edwards, Rico Hardnett, Christopher Fenn, and the City of Dadeville in connection with an alleged unlawful *Terry*[1] stop and seizure which resulted in the fatal shooting of Fletcher Ray Stewart.[2]

Before the Court are cross motions for summary judgment. (Docs. 89, 97, 107, 129). The parties have been afforded an opportunity to fully brief the matters, and the court heard argument on February 6, 2017. For the reasons stated herein, it is the **RECOMMENDATION** of the undersigned that the Plaintiff's Motions for Partial Summary Judgment (Docs. 89, 97) be **denied**; Defendants' Motion for

---

[1] *Terry v. Ohio*, 392 U.S. 1, 19–20, 30, (1968) (holding that law enforcement officers may seize a suspect for a brief, investigatory stop if they have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and the stop was reasonably related in scope to the circumstances which justified the interference in the first place).

[2] Plaintiff sued several other Defendants and raised additional state law claims that have been dismissed. *See* (Doc. 142). The only state law claim not dismissed with prejudice is Plaintiff's wrongful death claim against Hardnett, Fenn, and the City of Dadeville in count seven. *See id.* at 2.

Summary Judgment (Doc. 129) be **granted** as to counts I, II, III, and VII, and **denied as moot** as to counts V and VI; and Defendant Bryan Edwards' Motion for Summary Judgment (Doc. 107) be **granted in part** as to Plaintiff's claim of an unlawful arrest in count II, and in all other respects, it is recommended Bryan Edwards' motion for summary judgment be **denied**.

## I.      JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1343(3) as to Plaintiff's federal causes of action, and the court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a). The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both.  *See* 28 U.S.C. § 1391.  On January 5, 2017, this matter was referred to the undersigned by the Honorable Clay D. Land for disposition or recommendation on all pretrial matters. (Doc. 35); *see also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Bd. of Educ. of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III.   PROCEDURAL AND FACTUAL BACKGROUND

*Parties and Claims*--Plaintiff Mary Lee Davis ("Davis") is the niece and appointed administrator of the Estate of Fletcher Ray Stewart, deceased ("Stewart"). (Doc. 27, ¶ 4). She initiated this action in October 2016 against numerous Defendants alleging constitutional violations and state law claims. (Doc. 1). Davis sought and was granted leave to amend her complaint. (Docs. 25, 26). The First Amended Complaint is the operative complaint. (Doc. 27). Counts IV, V, VI, VIII, and part of VII of the Amended Complaint have been dismissed. (Doc. 142). The Defendants that remain are Bryan Edwards ("Edwards"), Rico Hardnett ("Hardnett"), Christopher Fenn ("Fenn"), and the City of Dadeville. Counts I, II, and III of the First Amended Complaint assert claims for constitutional violations against Edwards, Hardnett, and Fenn for liability pursuant to 42 U.S.C. § 1983. (Doc. 27). Count I alleges these Defendants conducted an unlawful *Terry* stop in violation of the Fourth Amendment. *Id*., ¶¶ 34–37. Count II alleges these Defendants are liable for an unlawful seizure or arrest. *Id*., ¶¶ 38–41. Count III claims Edwards, Hardnett, and Fenn used unlawful and excessive force. *Id*., ¶¶ 42–45.

The claims remaining in Count VII seek to hold Hardnett, Fenn, and the City of Dadeville liable for non-negligent state law claims of wrongful death under ALA. CODE §6-5-410 (1975).  *Id.*, ¶¶ 72–74. These claims were dismissed without prejudice, but Plaintiff was given the opportunity to amend.  (Doc. 142 at 2).  If she chose to amend her wrongful death claims against these Defendants, Davis was to file her amended pleading no later than January 15, 2018.  *See* (Doc. 150).  No amended pleading was filed.

*Factual Background*--On February 11, 2015, Stewart's nephew, Bennie Welch, saw Stewart walking alone on Booger Hollow Road at approximately 11:30 a.m.  (Doc. 109-5, ¶ 3).  According to Welch, Stewart was angry and said he was going home to get his gun.  *Id.*  About fifteen minutes later, he saw Stewart on Booger Hollow Road with "what appeared to be a 9 mm or 40 caliber pistol."  *Id.*, ¶ 4.  Because he was concerned that Stewart might hurt someone, Welch called 911 to report Stewart's actions.  *Id.*, ¶ 5.  When Welch was driving home, he saw Stewart again waving the pistol.  *Id.*  When Welch arrived home, he heard six gunshots.  *Id.*  Stanley Cameron was with Welch at the time and provided an affidavit filed by Edwards which is consistent with Welch's statement.  (Doc. 109-6).

Pertinent excerpts of the 911 call by Welch consisted of the following exchange:

911 Operator:  Tallapoosa 911.  Where's your emergency?
Welch:  It's on Booger Hollow Road.
911 Operator:  Where at on Booger Hollow Road, sir?
Welch: Yes, ma'am.  My Uncle Fletcher.  He just –you know Fletcher Ray-- don't you– Stewart?
911 Operator: Yes, sir.
Welch:  Okay. Well, he just – he just walked past us, and he's rasing [sic] all kind of Cain, and he's got a pistol in his pocket.
Male Speaker: He flashed it. I seen it.
Welch: Yeah. He showed it –you know, pulled it out when he walked by. You hear me?
911 Operator: Yes, sir. I'm listening.  What's the address that you're at?
Welch: What's this address?   78 Hollow Springs Road.
…
911 Operator:  Okay.  I'm not showing a 78 Hollow Springs Road.  Oh, here it is.  All right. And what's your name, please?
Welch: My name is Benny Welch.

4

…
911 Operator: All right. So we'll send someone out there. Okay?
Welch: Okay. I don't want to see him get hurt or nothing. You know what I'm saying?
911 Operator:  Yeah, I understand. When was the last time you saw him?
Welch: A couple of days ago. He was fine then.
911 Operator: When was the last time you saw him holding the gun?
Welch:  I just now seen him. He's walking down the road.

(Doc. 109-9 at 2–4).

Kate Dowling, who works as both 911 operator and dispatcher for Tallapoosa County Sheriff's Office, received the call from Welch about Stewart.  (Doc. 109-7 at 23:5–20, 48:3–6).  In relaying the information to Edwards, she stated, "Hey, I need you to be 84[3] to 78 Hollow Springs Road. They said Fletcher Ray is out there walking up and down hollering, he has got a pistol that he is waving around."  (Docs. 107 at 62:1–7; 109-10 at 2:1–4).  Edwards asked for back-up.  (Doc. 109-2, ¶ 6).  Dowling then relayed over the radio, seeking help from anyone who could assist: "Qb to 78 Hollow Springs Road. … I have Fletcher Ray with a 1032 going up and down the road"[4].  (Docs. 109-10 at 2; 109-7 at 62:8–12).  City of Dadeville police officers Hardnett and Fenn responded to the call for help. (Docs. 109-3 at 118; 109-4 at 40–41).

Edwards was familiar with Stewart and had interactions with him fifteen to twenty times prior to the day of the shooting.  (Doc. 109-1 at 63–97).  Stewart was known by Edwards to be intellectually disabled. *Id.* at 93:8–16.  Stewart had always been pretty easy-going with Edwards.  *Id.* at 92:10–19.  Edwards had seen Stewart with a knife, a taser, and brass knuckles on prior occasions, but never a real gun or a BB gun.  *Id.* at 93:20– 97:20.  Edwards had always been able to interact with Stewart on past occasions without any use of force.  (Doc. 109-2, ¶ 9).  In various incidents involving Stewart in which

---

[3] "84" is a code used by the Tallapoosa County Sheriff's Office to mean "en route."  (Doc. 109-11 at 2).

[4] "10-32" is the code for "man with a gun."  (Doc. 109-11 at 2).

5

Edwards was called to the scene, when Edwards arrived, he was able to diffuse the situation by giving Stewart a ride home, giving him a Dr. Pepper and a snickers, talking to him, or giving him five or ten dollars. (Doc. 109-1 at 65, 70, 82).

Edwards testified that when he arrived at the scene on the date of the incident, he observed Stewart standing alone on the road. *Id.* at 136:2–3.[5]  No one was in the area, and Edwards did not see Stewart with a weapon. *Id.* at 138:6–13, 263:7–8.  Further, Edwards did not observe Stewart yelling or cursing at anyone or even see anyone in Stewart's vicinity. *Id.* at 253:15–254:5.  Edwards did not see Stewart be violent to anyone. *Id.* at 264:3–14.  And he did not hear of Stewart committing any violence other than having a gun.  *Id.* at 264:15–23.  When he pulled his marked vehicle beside Stewart that Stewart turned, saw that it was a police vehicle, and ran.  *Id.* at 136:12–21.  Edwards' window was up and neither of them said anything to each other.  *Id.* at 137.

When Edwards chased Stewart into the woods, Stewart was not making any threats or any threatening motions or gestures.  *Id.* at 147:10–21.  After Edwards' commanded him several times to stop, Stewart stopped.  *Id.* at 139:10–140:11.  Edwards told Stewart to show him his hands, and Stewart complied.  *Id.* at 140:12–16.  Edwards was about ten to fifteen feet from Stewart when Stewart stopped. All three of the officers were stopped as well with their guns drawn and pointed at Stewart.  *Id.* at 149:21– 150:17, 159:21–160:7.  Edwards was shouting at Stewart to show his hands and then he asked him where he threw the gun.  *Id.* at 148:14–21, 151:4.  Edwards testified he later heard on the videotape that Stewart said, "I'm fixing to use it." *Id.* at 152:15–17.  After Edwards asked Stewart where the gun was, Stewart reached behind his back and pulled out the gun.  *Id.* at 154:17–20.  Edwards saw Stewart's gun and then

---

[5] Edwards was deposed in May 2017.  (Doc. 109-1).  His subsequent affidavit in October 2017 stated he saw Stewart walking in the middle of the road.  (Doc. 109-2, ¶ 7).

fired five or six shots.  *Id.* at 154:17–20, 163:14–16.   In his affidavit, Edwards states, "Fletcher then reached behind his back with his right hand and quickly pulled his hand from behind his back.  I saw a pistol and it appeared to me that Fletcher was raising it to shoot me."  (Doc. 109-2, ¶ 14).   Neither Fenn nor Hardnett fired their weapons.  (Doc. 109-1 at 160:8–16).  Edwards fired his weapon at Fletcher in fear for his life.  (Doc. 109-2, ¶ 15).  Two of the shots hit Stewart; he died from his injuries.  (Doc. 109-18).

Hardnett and Fenn responded to the call from Tallapoosa County Sheriff's Office that an officer needed assistance because of a complaint that Fletcher was walking down the street with a gun.[6]  (Doc. 109-3 at 118:9–17).  Hardnett testified that he and Fenn were "just there to assist [Edwards]."  *Id.* 59:22–25.  Fenn confirmed that they were there for back-up.  (Doc. 109-4 at 41:20).  "We don't pick and choose who we get to back up. If an agency requests backup, we go."  *Id.* at 41:20–22. According to Fenn, he went into the woods after Stewart because the officer he was there to back up pursued into the woods. *Id.* at 42:8–9.  Similarly, Hardnett testified, "we came out to assist Deputy Edwards and Mr. Stewart ran off into the woods. We ran after him."  (Doc. 109-3 at 93:21–22).   Hardnett elaborated, "I followed Deputy Edwards because I was there to assist.  So if he's going out into the woods, then I'm going out in the woods also."  *Id.* at 149:19–22.

According to Hardnett, as Edwards pursued Stewart into the woods, Edwards was yelling at Stewart to stop. *Id.* at 120:24–25. Stewart stopped.  *Id.* at 121:3–4.  Edwards, Hardnett, and Fenn had

---

[6] Prior to the date of the incident, Hardnett would see Stewart riding his bike to the gas station weekly.  (Doc. 109-3 at 102:24–103:16).  Hardnett never had personal contact with Stewart and had no specific knowledge about Stewart's mental condition although he had heard several officers make comments about it.  *Id.*, 107–08.  Fenn was aware Stewart had a reputation for becoming loud, irrational and violent and knew from Tallapoosa Sheriff personnel to use caution when interacting with him.  (Doc. 109-4 at 82:18–88:7, 144:12–146:5).  Fenn was unaware of Stewart's mental condition.  *Id.*

their guns drawn and pointed at Stewart.  Edwards yelled at Stewart several times "let me see your hands" and asked Stewart where the gun was.  *Id.* at 93:23–25; 123:1–5.  At one point, Stewart put his hands up and out to his sides like a T.  *Id.* at 125:8–126:22.  Edwards asked Stewart where the gun was. *Id.* at 127:1–4.  Stewart put his hands at his side, and Edwards yelled again at him to show his hands. *Id.* at 127:7–10. Edwards was yelling several different things at Stewart pertaining to his hands and the gun.  *Id.* at 123:1–5.  Hardnett did not say anything to Stewart and he did not hear Fenn say anything. *Id.* at 123:21–124:10.  According to Hardnett, "[Stewart] reached behind his back real quick and came up real quick and then they started shooting."[7]  *Id.* at 127:11–13; *see also id.* at 94:1–2.  Hardnett did not see a gun in Stewart's hand before Edwards shot him.  *Id.* at 130:8–12.  Fenn did not see a gun in Stewart's hand before Edwards fired. (Doc. 109-4 at 117:16–18). Edwards fired three to four shots in rapid succession.  (Doc. 109-3 at 130:13–21).  Neither Hardnett nor Fenn fired their weapons.  *Id.* at 59:22–60:9.  Hardnett observed the gun fly out of Stewart's hand when he fell to the ground after being shot.  *Id.* at 132:1–3.

After the shooting, Edwards and Fenn had run and taken cover behind a tree.  *Id.* at 131:25–132:6).  Hardnett kept his gun pointed at Stewart and moved slowly toward him to move the gun out of Stewart's reach.  *Id.* at 131:24–135:8; 109-4 at 6–7.  Hardnett opened Stewart's shirt and saw he had been shot. (Doc. 109-3 at 134:3–14). EMS was called.  *Id.* at 28:12–18.  He tried to control the bleeding while he told Fenn to go get a first aid kit.  *Id.* at 23:21–25:14; 109-4 at 55:4–14.  When Hardnett picked up Stewart's pistol, he could tell it was not real.  (Doc. 109-3 at 136:2–6).

---

[7] There is no evidence that anyone other than Edwards fired a weapon.

8

*Expert Evidence and Motions*[8]--In support of her motions for partial summary judgment, Davis submitted the expert report of George Kirkham, professional criminal justice consultant.  (Doc. 95-3).  Among other opinions, Dr. Kirkham opined that "when Mr. Stewart declined to interact with defendants and went into the wooded area, their attempt to compel him by show of force, i.e., by stopping Mr. Stewart with guns drawn and pointed at him—to submit to their questioning was a deliberate violation of the Fourth Amendment." *Id.* at 4.  He also opined that Edwards and the two officers rushing into the woods toward Stewart's location, without making any initial attempt to verbally communicate with Stewart, involved the foreseeable risk of intensifying fear or producing panic in a mentally challenged person such as Stewart.  *Id.* at 6.  Defendants have moved to exclude or limit the testimony of George Kirkham.  (Doc. 133).

Davis has also offered the expert report of biomedical engineer Paul Lewis.  (Docs. 95-6, 148-1).  Mr. Lewis reviewed a slow-motion video[9] of Edwards' body camera video from the night of the incident and offered an opinion regarding whether Mr. Stewart's body movements prior to and in response to being shot are consistent with Stewart volitionally drawing and aiming his BB gun at the officers.  He opines that the evidence supports that Stewart still had his right hand behind his back when the first shot was fired by Edwards. (Doc. 95-6 at 17).  Defendants have moved to exclude the testimony and multiple opinions of Paul Lewis and strike the slow-motion video.  (Docs. 125, 126, 156).

Defendants have offered the opinions of forensic video analyst Grant Fredericks to rebut Paul Lewis' opinions.  (Doc. 127-7). Mr. Fredericks opines that the body camera video shows six shots were

---

[8] Pending motions regarding expert testimony will be dealt with in a separate Report and Recommendation.

[9] The slow-motion video taken from the footage of Edwards' body camera was prepared by Laurie Evans, forensic technology examiner for the Alabama Law Enforcement Agency. (Doc. 148-2 at 6–7).

fired.  Based on his analysis of the video, he opines that the video and audio lack synchronization, and because of this, Paul Lewis erred in his evaluation of the timing of the shots fired.  Davis has moved to exclude or limit the opinions and testimony of Grant Fredericks.  (Doc. 127).

## IV.    DISCUSSION

### A. Defendants' Motion for Summary Judgment (Doc. 129)

#### 1. Counts V and VI -Municipal or Supervisory Liability under § 1983

Barbour and the City of Dadeville move for summary judgment as to counts V and VI.  These counts were previously dismissed by the court without leave to amend.  *See* (Docs. 96, 142).  Accordingly, the motion for summary judgment (Doc. 129) by Barbour and the City of Dadeville as to the claims against them in counts V and VI is due to be **denied as moot**.

#### 2. Count VII-Wrongful Death

Hardnett, Fenn, and the City of Dadeville are entitled to summary judgment as to count VII because Plaintiff failed to timely amend her claims under count VII against these Defendants.  This court entered an order dismissing without prejudice the non-negligent claims asserted against these Defendants in count VII.  (Doc. 142).  If she so chose, Plaintiff was permitted leave to amend that count against those Defendants, but was required to do so no later than January 15, 2018.  (Doc. 150); *see also id.*  Plaintiff never amended count VII, nor did she seek additional time in which to file her amendment.  Thus, Plaintiff has abandoned those claims, and Defendants Hardnett, Fenn, and the City of Dadeville are entitled to summary judgment in their favor as to count VII.

#### 3. Counts I, II, and III-Terry Stop, Unlawful Arrest or Seizure, Excessive Force

Defendants Hardnett and Fenn seek summary judgment in their favor on the basis of qualified immunity as to counts I, II, and III.  (Doc. 129).  Qualified immunity completely "protects government

10

officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The essence of a qualified immunity analysis is an officer's objective reasonableness. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1962); *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). If reasonable officers could differ on the lawfulness of the defendants' actions, the defendants are entitled to immunity. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). Qualified immunity "gives ample room for mistaken judgments" but does not protect "the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

"The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation."  *Tinker v. Beasley*, 429 F.3d 1324, 1326–27 (11th Cir. 2005).

The qualified immunity analysis first requires an officer "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).  In determining whether an official is acting within the scope of his discretionary authority, courts consider "whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'"  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Here, Defendants Hardnett and Fenn responded to a call from Tallapoosa County Sheriff's Office that an officer needed back-up because a complaint was received that Fletcher had a gun. Hardnett and Fenn's conduct in responding to the 911 call would certainly fall within their discretionary authority. Plaintiff's counsel conceded as much at the hearing on this matter.[10]  As for Hardnett and Fenn's conduct once they arrived at the scene, the evidence shows they were there to assist Edwards.  They followed Edwards into the woods as back-up because he was pursuing Stewart into the woods.  Deciding, literally on the run, how (and even whether) to provide assistance and back up for another law enforcement officer is plainly within Hardnett and Fenn's discretionary authority.

Once a defendant successfully shows that he was acting within his discretionary authority, courts use a two-part test to determine whether qualified immunity applies.  In *Saucier v. Katz*, the Supreme Court directed courts to first  determine whether there was a constitutional violation and to second determine whether the constitutional right in question was clearly established. 533 U.S. 194, 201 (2001). The Court subsequently held, however, that courts need not adhere to *Saucier's* rigid two-step inquiry, and courts can decide the second question without reaching the first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

> On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Id*.

---

[10] At the hearing, Plaintiff's counsel clarified he was not disputing that the officers had a right to go out and investigate the 911 call.

Here, consideration of the second prong first reveals Plaintiff is unable to demonstrate the constitutional right in question was clearly established as it relates to Hardnett and Fenn's conduct. A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The pertinent issue is whether the state of the law at the time of the alleged misconduct gave these Defendants "fair warning" that their actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To demonstrate a violation of clearly established law, a plaintiff can either point to a case with materially similar facts holding that the conduct engaged in was illegal or show that a federal statute or constitutional provision is specific enough to demonstrate their conduct was illegal. *Storck*, 354 F.3d at 1317. Applied here, no federal statute or constitutional provision is specific enough, and Plaintiff fails to point to any case materially similar, nor has the court found one, as it relates to Hardnett and Fenn's involvement so as to give these Defendants fair warning that their presence and conduct at the scene as back-up was unconstitutional. It is undisputed that neither Fenn nor Hardnett used their weapons or any type of force at any time. They did not engage with Stewart nor command him prior to Edwards shooting Stewart. Edwards was the one giving Stewart multiple commands. Moreover, the testimony supports the shooting happened too quickly for Fenn or Hardnett to have done anything to prevent the incident. Thus, Hardnett and Fenn's motion for summary judgment as to counts I, II, and II is due to granted on the basis of qualified immunity.

### B. Bryan Edwards' Motion for Summary Judgment (Doc. 107)

Edwards seeks summary judgment in his favor on the basis of qualified immunity as to the three claims remaining against him in count I (illegal *Terry* stop), count II (unlawful seizure or arrest), and count III (excessive force). (Doc. 107).

> Even at the summary judgment stage, not all defendants entitled to the protection of the qualified immunity defense will get it. The ones who should be given that protection at the summary judgment stage are those who establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity. And that will include defendants in a case where there is some dispute about the facts, but even viewing the evidence most favorably to the plaintiff the law applicable to that set of facts was not already clearly enough settled to make the defendants' conduct clearly unlawful. But if the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.

*Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).  Because the court finds disputed issues of material fact are inconsistent with qualified immunity being granted, Edwards' motion for summary judgment is due to be denied on all claims except to the extent Plaintiff seeks to hold Edwards liable for an unlawful arrest in count II.

### 1. Count II –Unlawful Arrest

A § 1983 false arrest claim requires an arrest.  *Shaw v. City of Selma*, No. CV 16-0007-WS-M, 2017 WL 1025677, at *10 (S.D. Ala. Mar. 15, 2017); *see also United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) ("the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest"); *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991) ("this circuit has recognized that an officer's not taking the detained individual to a station or office, not conducting a full search of the person, or not touching the individual indicate an investigatory stop rather than an arrest").

The determination of "whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." *Blackman*, 66 F.3d at 1576 (citations omitted).  Given the brief encounter in the woods here, it cannot

be said that the stop and seizure of Stewart had matured into an arrest.  Thus, to the extent count II purports to assert a claim based on a false arrest, that portion of the claim fails.

### 2. Terry Stop and Unlawful Seizure – Counts I and II

As discussed above, the three-part inquiry for qualified immunity begins with determining whether the officer was engaged in his discretionary authority.  Like Fenn and Hardnett, it was clearly within Edwards' discretionary authority to go out and investigate the situation in response to the 911 call.  Once at the scene when Edwards finds Stewart standing alone on the country road, however, the issues become less clear.  Based on the undisputed evidence, when Edwards spotted Stewart on Booger Hollow Road, Stewart was not hollering or waving a gun.  Stewart was standing alone.  No one was in the vicinity. Stewart was not engaged in any threatening behavior.  Edwards did not observe Stewart with a gun.  Edwards drove up beside Stewart, and upon seeing the marked vehicle, Stewart turned away and ran.  No words were exchanged at that point.

Courts recognize that "law enforcement officers may seize a suspect for a brief, investigatory *Terry* stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *U.S. v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)).  "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal quotation marks omitted). Reasonable suspicion requires "more than just a hunch," and "[t]he validity of the stop must be considered in view

of the totality of the circumstances." *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995) (citing *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989)).

An investigatory stop requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotation marks omitted).

Here, Edwards' decision to pursue Stewart into the woods must be considered in the context of the totality of the circumstances.  He had previously received a report that Stewart was waving a gun, but upon confronting Stewart on the country road, there was no one else in the vicinity and no evidence of Stewart waving the gun nor engaged in any type of threatening or criminal behavior.  Subject to certain exceptions, Alabama is an open carry state.  *See* ALA. CODE § 13A-11-7(c) (providing "[i]t shall be a rebuttable presumption that the mere carrying of a visible pistol, holstered or secured, in a public place, in and of itself, is not a violation of this section"); ALA. CODE § 13A-11-75(g) ("This section shall not be construed to limit or place any conditions upon a person's right to carry a pistol that is not in a motor vehicle or not concealed."); *see also Northrup v. City of Toledo*, 785 F.3d 1128, 1132 (6th Cir. 2015) (being armed, without more, in an open carry state, does not justify detention).  Thus, Stewart standing on or walking down a country road, carrying a gun, without more, is not unlawful in Alabama.

16

On the other hand, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen." *Fla. v. Royer*, 460 U.S. 491, 497 (1983). "The person approached, however, need not answer any question put to him [or] may decline to listen to the questions at all and may go on his way." *Id.* at 497–98 (citing *Terry*, 392 U.S. at 32–33 (Harlan, J., concurring); *id.* at 34 (White, J., concurring)).

Davis argues whether Stewart walked or ran away, he was so entitled because there was no reliable evidence that he was committing or about to commit a crime. A "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citations omitted). Edwards contends that Stewart's running away was unusual and supports his reasonable suspicion to pursue him into the woods. However, considering the totality of the circumstances and the inferences that can be drawn therefrom, including Edwards' familiarity with Stewart, his knowledge of Stewart's intellectual disability, his prior interactions with Stewart, the lack of threatening behavior by Stewart when Edwards observed him on the roadway, and the absence of any others in the vicinity, draw into question whether it was objectively reasonable for Edwards to suspect Stewart was engaged in criminal behavior or about to commit an unlawful act. Viewing the facts in a light most favorable to Plaintiff and due to the conflicting inferences, a proper characterization of Edwards' decision to chase Stewart into the woods cannot be made on summary judgment.

For purposes of the qualified immunity analysis, Plaintiff argues that the Supreme Court's opinion in *Florida v. J.L.*, 529 U.S. 266 (2000) is dispositive of the issue that it was clearly established that an officer may not conduct a *Terry* stop and seizure based on an anonymous tip that a citizen is

walking down the road possessing a weapon.  In *J.L.*, the Miami-Dade Police received an anonymous call that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  *Id.* at 268.  The question considered by the Court was whether the anonymous tip that a person is carrying a gun, without more, was sufficient to justify the police officer's stop and frisk.  *Id.*  In concluding that the stop and frisk was not justified, the Court considered the anonymity of the call and noted that apart from the tip, the officers had no reason to suspect J.L. of illegal conduct, the officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements.  *Id.*

> The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.

*Id.* at 271.

Defendants argue J.L. is factually distinguishable because Welch was not an "anonymous" caller. Davis argues Welch would be considered anonymous because the 911 operator did not know who Welch was.  In the transcript of the dispatch call, the 911 operator does not specifically mention Welch, but rather states, "They said Fletcher Ray is out there walking up and down hollering, he has got a pistol that he is waving around."  (Doc. 109-10 at 2:1–4).  Edwards testified he did not receive any additional information regarding the situation other than the communications from dispatch.  (Doc. 109-1 at 114–21, 126–28, 133).  Thus, it cannot be said that Edwards knew the report of Stewart carrying a gun to be particularly reliable in any event, since Edwards, on the fifteen to twenty interactions with him in the past, he had not previously seen Stewart with a gun.

18

Edwards argues the *Wardlow* case establishes that his conduct did not violate the Fourth Amendment. In *Wardlow*, an individual engaged in flight upon being approached by uniformed police officers who were patrolling an area known for heavy narcotics trafficking. 528 U.S. at 121–22. The Court held under such circumstances, including the individual's headlong flight, the officers' stopping the individual did not violate the Fourth Amendment. The Court explained, "[I]t was not merely [the individual's] presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." *Id.* at 124. Notably here, Stewart was not in a narcotics trafficking or other high crime area, nor was he suspected of being involved in drug-related activities or any other crime. Regardless of whether the 911 call is treated as anonymous or more reliable than that, nothing in its content or Edwards' observations suggested any illegal activity. Edwards' decision to escalate the encounter by pursing Stewart with his service weapon drawn must be considered in light of these circumstances.

Edwards cites the Court's recent opinion in *D.C. v. Wesby*, __ U.S. __, 138 S. Ct. 577 (2018), to support his position that Stewart's "headlong flight" justified Edwards' conduct in pursuing him. In *Wesby,* the District's Metropolitan Police Department received a complaint about loud music and illegal activities at a house. *Id.* at 583. The complaint was made by a former neighborhood commissioner, who told police that the house had been vacant for several months. *Id.* When the officers arrived at the scene, they spoke with several neighbors who confirmed that the house should have been empty. *Id.* Consistent with the complaint, the officers heard loud music playing inside. *Id.* The officers knocked on the door. They saw a man look out the window and then run upstairs. *Id.* One of the partygoers opened the door and the officers entered. *Id.* The house was in disarray and appeared to be a makeshift strip club. *Id.*

19

It was undisputed that the partygoers were using the house against the owner's will, but notwithstanding, they argued the officers lacked probable cause to arrest them because the officers had no reason to believe that they "knew or should have known" their "entry was unwanted."  *Id.* at 586.  In rejecting this argument, the Court concluded that considering the totality of the circumstances, including the reports of multiple neighbors confirming the house was to be vacant, the condition of the house, the loud music, the alcohol on the floor, and the sparse furniture, the officers made an "entirely reasonable inference" that the partygoers were knowingly taking advantage of a vacant house as a venue for their late-night party.  *Id.* In this case, the "flight" appears to be just one of many factors considered by the officers to support probable cause.

For analysis of the case at bar, *Wesby* is useful only insofar as it confirms that courts must look at the totality of circumstances as known by the officers. It offers no guidance on how to analyze the "flight" from officers of an individual not suspected of a crime and posing no present threat to others.

The Court finds *J.L.* to be instructive on the issue of whether the constitutional right not to be stopped and detained in these circumstances was clearly established.  Under *J.L.*, there is a factual issue whether the circumstances here, as a whole (*i.e.,* the call, prior dealings, and what the officer saw at the roadside), support a stop (as opposed to a look-see) under Alabama law which is an open-carry state. Additionally, it is doubtful that a report of someone "raising Cain" is serious or specific enough to meet the *J.L.* standard, at least if the jury were to find there was nothing else.  Because there is a disputed factual issue as to whether the circumstances as a whole support Edwards' stop and seizure of Stewart, Edwards' motion for summary judgment on counts I and II are due to be denied.

Edwards alternatively argues he is entitled to summary judgment on counts I and II because the claims abated with Stewart's death.  Viewing the facts in a light most favorable to Plaintiff as the non-

20

moving party, Edwards' shooting of Stewart caused his death which would not have occurred but for the alleged unlawful stop and seizure.  If a jury finds that the stop and seizure were unconstitutional, it could similarly conclude that the stop set into motion actions that resulted in Stewart's death.  Case law in this circuit supports a plaintiff's § 1983 cause of action when a constitutional violation causes the injured party's death.  *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2011).

### 3. Count III – Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).  The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under" a reasonableness standard. *Graham*, 490 U.S. at 395.  As a general rule, an officer has the power to use a reasonable amount of force in making an arrest or investigatory stop. *Id.* at 396 (citing *Terry*, 392 U.S. at 22–27). When a plaintiff claims an officer used excessive force, courts utilize an objective test to determine the reasonableness of the officer's actions in light of the totality of the circumstances. *Id.*

Courts will find an officer's use of force to be excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. *Graham*, 490 U.S. at 397 (quotation omitted). The amount of force used will be found reasonable only if it was "necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (quotation omitted). The Supreme Court has identified several factors courts should consider in evaluating whether force was constitutionally necessary: "[1] the severity of the crime at issue, [2] whether the suspect poses an

immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate [the *Graham*] factors.").

The Eleventh Circuit has recently provided additional guidance as to such issues.

In an excessive-force case, where qualified immunity has been pled, "[o]ur circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional" under the Fourth Amendment. *Fils v. City of Aventura*, 647 F.3d 1288, 1291 (11th Cir. 1991). The first considers "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Id.* (citation, internal quotation marks, and alteration omitted). "This method does not require that the case law be 'materially similar' to the officer's conduct;" "[b]ut, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41, 122 S. Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)).

The second method looks "not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration omitted) (emphasis added). The cases fitting this method are known as "obvious clarity," *id.* (quoting *Vinyard*, 311 F.3d at 1355), "a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation," *id.* (quoting *Lee*, 284 F.3d at 1198-99).

In considering an excessive-force case, a court should determine whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation relative to the response of the apprehended person. The latter is the sort of unconstitutional conduct that deprives an officer of qualified-immunity protection in an obvious-clarity case.

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1315–16 (11th Cir. 2017).

Applying the *Graham* and *Stephens'* factors here, it cannot be said they indubitably weigh in Edwards' favor as he would urge the court to find.  When considering the severity of the crime at issue, Stewart's carrying a gun though potentially dangerous, without more, is not a crime.  And although there

22

were reports of his "raising Cain," Edwards did not observe that type of behavior upon confronting Stewart, and in any event, a menacing or disrupting the public peace would be a minor infraction (and one that was not continuing) that would not justify the force used.  On the second factor, Edwards argues that Stewart's possession of a gun posed an immediate threat[11] to the safety of the officers, but again when Edwards first approached Stewart there was nothing threatening about his behavior.  Further, there are factual issues as to how threatening Stewart's behavior was prior to Edwards' first shot.  Lastly, on the issue of evading, although Stewart initially "fled" from Edwards, once he had stopped in the woods, there was no claim that he was attempting to resist or flee further.  Thus, issues of fact remain as to whether the amount of force used by Edwards was constitutionally necessary or appropriate.

Accordingly, it is respectfully recommended that Edwards' motion for summary judgment (Doc. 107) as to count III be denied.

### C. Plaintiff's Motions for Summary Judgment as to Counts I and II (Doc. 89) and Count III (Doc. 97)

Plaintiff seeks partial summary judgment against Defendants as to her § 1983 constitutional claims in counts I, II and III.  As the court has recommended above, Hardnett and Fenn's motion for summary judgment is due to be granted in their favor on the issue of qualified immunity on those counts, and therefore it is recommended that Plaintiff's motions for summary judgment (Docs. 89, 97) against Hardnett and Fenn be **denied**.

Turning to Plaintiff's claims against Edwards, as discussed above, material factual disputes exist regarding Edward's entitlement to qualified immunity.  In a light favorable to Edwards, these factual disputes preclude summary judgment in Plaintiff's favor because Plaintiff is unable to satisfy her burden

---

[11] Of course, had Edwards not decided to pursue Stewart, there would have been no interaction and hence no possible threat to Edwards or the other officers.

of proof—as it relates to Edwards—whether there was a constitutional violation and whether the constitutional right in question was clearly established at the time of the alleged conduct.  Accordingly, Plaintiff's motions (Docs. 89, 97) are due to be **denied** as to Edwards.

## V.     CONCLUSION AND RECOMMENDATION

A final word is not remiss. Law enforcement officers are required to perform difficult and often dangerous duties. They are regularly called to deal with uncertain situations and hostile individuals with indeterminate intentions and capabilities. Such situations are perilous. To meet their responsibilities in handling all situations, they are necessarily provided with authority, power and discretion, and they are accountable for their actions. The circumstances of this case, however all the facts and inferences may ultimately be found, exemplify a continuing national tragedy whereby encounters between officers and citizens too often proceed as confrontations between enemies.

In the present case, starting from a nephew's plea, "I don't want to see him get hurt or nothing", we have a sequence of events ending with the death of a man known to suffer with a troubled personality. Law enforcement in responding to the plea to assure Mr. Stewart's safety, instead of following previous practices handling Mr. Stewart, turned a possible public safety inquiry into a violent personal clash with firearms. We will never understand why Mr. Stewart declined to speak with Officer Edwards and, instead, took off into the woods. Nor will we likely really know why Officer Edwards decided he needed urgently to chase and confront a lone individual who, though reportedly armed, presented no apparent or immediate threat to himself or others. In the absence of circumstances suggesting a need for an exigent encounter, armed pursuit of Mr. Stewart begs for explanation. Conducting that pursuit as if it were a military battle, displaying an all too common mindset, created the setting for a perilous and ultimately

fatal outcome. Assessing Mr. Stewart's conduct and Officer Edwards' handling of the situation is for a jury of their peers.

Accordingly, for the reasons as stated, it is respectfully **RECOMMENDED** that:

1. Plaintiff's Motions for Summary Judgment (Docs. 89, 97) be **denied**;

2. Defendants' Motion for Summary Judgment (Doc. 129) be **denied as moot** as to counts V and VI and **granted** as to the remaining counts I, II, III, and VII; and

3. Edwards' Motion for Summary Judgment (Doc. 107) be **granted** as to count II to the extent count II asserts a claim for unlawful arrest, and in all other respects, it is recommended that Edwards' motion for summary judgment (Doc. 107) be **denied**.

## VI.    NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Accordingly, it is hereby **ORDERED** that any objections to the Report and Recommendation shall be filed on or before **March 7, 2018**.  Responses to any objections are due **March 14, 2018. No replies shall be filed.** A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; *see also* 28 U.S.C. § 636(b)(1).

**Recommended** this 21st day of February 2018.


_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE